MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2026 ME 62
Docket:      Pen-25-308
Argued:      March 4, 2026
Decided:     July 14, 2026

Panel:       STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

DANIELLE NADEAU

v.

JASON D. NADEAU

MEAD, J.

[¶1]  On a snowy evening in January 2011, thirty-seven-year-old Jason Nadeau drove his cousin, sixteen-year-old Danielle Nadeau, from Fort Kent to Bangor.  During that drive, he subjected her to unwanted sexual questions and touched her breasts, leg, and genitals over her clothes.  Later that night at the apartment of a relative, he exposed himself to her.  He then threatened to kill her family if she told anyone about what had happened.  Over a decade later, Danielle brought this action against Jason.[1]  The Superior Court (Penobscot County, *Mallonee, J.*) found Jason liable for negligence, negligent infliction of emotional distress, and intentional or reckless infliction of emotional distress

---

[1]  Because the parties have the same surname, we refer to them by their first names.

2

and awarded Danielle one million dollars in damages. Jason appeals from the judgment, arguing that Danielle's claims are barred by the statute of limitations and that she failed to prove her claims as a matter of law. We hold that the claims are not barred by the statute of limitations. Although we agree with Jason that Danielle did not prove two out of three of her claims, we hold that the evidence supports an inference that Danielle suffered severe emotional distress and therefore affirm the judgment on Danielle's claim for intentional infliction of emotional distress.

## I. BACKGROUND

[¶2] In January 2024, Danielle filed a complaint for (1) negligence, (2) negligent infliction of emotional distress (NIED), and (3) intentional or reckless infliction of emotional distress (IIED), and requested punitive damages. A bench trial was held on May 22 and 23, 2025, at which Danielle, Jason, and several of their family members and friends testified.

[¶3] We view the evidence in the light most favorable to the prevailing party. *See In re Cyr*, 2005 ME 61, ¶ 16, 873 A.2d 361. The court heard testimony that, in January 2011, while Jason, Jason's father, and Danielle's father were on a snowmobile trip in Fort Kent, Jason's father suffered a heart attack. Jason's father and Danielle's father are brothers. Jason's father was first taken to the

hospital in Fort Kent, where the group met other family members, including Danielle.  Because a snowstorm was developing, he was taken to Eastern Maine Medical Center in Bangor by ambulance, rather than by helicopter.  It was decided that Danielle and Jason would drive together to Bangor in Jason's truck.  At the time, Danielle was sixteen years old and Jason was thirty-seven.  During the long trip from Fort Kent to Bangor, Jason asked Danielle questions about her sexual preferences and experiences and touched her breasts, leg, and genitals through her clothes.  Danielle testified that during the trip, Jason kept his hand over the truck door lock, preventing her from escaping the truck.  Before going to the hospital, the two stopped at Danielle's brother's apartment so that Jason could shower and change his clothes.  At the apartment, Danielle waited in the living area while Jason showered.  After Jason showered, he came out of the bathroom fully naked, stroking his erect penis.  Danielle, whose cell phone battery had died and who had no way to contact anyone about the situation, was scared and simply told Jason to go put clothes on.  Afterwards, on the drive from the apartment to the hospital in Bangor, Jason told Danielle that if she told anyone about what had happened, he would slit her family members' throats.

[¶4]  At the close of Danielle's case, Jason moved for a judgment as a matter of law, asserting that Danielle's claims were barred by the statute of limitations.  He argued, among other things, that in order to take advantage of 14 M.R.S. § 752-C's exception to the typical six-year limitations period for sexual acts towards minors, Danielle was required to prove that Jason acted with criminal negligence and that she had not done so because her testimony was that he acted with awareness, not negligence.  The court denied the motion. The court then pronounced its findings and judgment from the bench, stating,

> The first question before me is, what do I think happened?  And I – I'll just be blunt.  I believe you[, Danielle], and I don't believe you[, Jason].  And it's not even close.  I could – I could apply any standard of proof recognized by the law, and I would find in Danielle's favor . . . .
>
> I find there was . . . [a] 16-year-old girl trapped in a truck with a 37-year-old man in a snowstorm during a family emergency literally for hours. . . . [D]riving through very sparsely populated areas in which Jason solicited this sexual encounter, hoping, I'm sure, that Danielle would consent.  She didn't and then he persisted. . . .
>
> And then he compounded that by groping her and groping her repeatedly for the several hours that they were in the truck . . . that was a very telling detail that his hand was over the lock, really nothing that she could possibly do.  And that was the – and I'm satisfied that was the proximate cause of the damages that I will have to address later . . . .
>
> The damage was compounded further by this gross overture in [Danielle's brother's] apartment give – given Danielle's earlier

refusal. That was just further – it was a lot of things, but it was certainly further negligence. And it was compounded further by the threats against her brother and her . . . parents. And I believe that those threats were issued.

So as far as I'm concerned, this extended incident that I just described is the source of all of Danielle's damages . . . .

[¶5]  The court entered judgment for Danielle and awarded her $750,000 in compensatory damages and $250,000 in punitive damages, applied separately, but not cumulatively, to each count. Jason timely appealed. *See* M.R. App. P. 2B(a)(1), (c)(1).

## II. DISCUSSION

### A. Statute of Limitations

[¶6]  "Whether a claim is barred by the statute of limitations is a legal question subject to de novo review." *Andersen v. Dep't of Health & Hum. Servs.*, 2025 ME 59, ¶ 21, 340 A.3d 41 (quotation marks omitted). "In interpreting a statute, our single goal is to give effect to the Legislature's intent in enacting the statute." *Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 19, 107 A.3d 621. Statutory interpretation begins with "looking to the plain meaning of the statutory language and construing it to avoid absurd, illogical, or inconsistent results." *Waterman v. Wheeler*, 2025 ME 96, ¶ 4, 347 A.3d 1028 (quotation marks omitted).

### 1. Title 14 M.R.S. § 752-C

[¶7] In contrast to the default six-year statute of limitations for most civil actions, *see* 14 M.R.S. § 752 (2026), "[a]ctions based upon sexual acts toward minors may be commenced at any time." 14 M.R.S. § 752-C(1) (2026). Section 752-C(2) defines "sexual acts toward minors" as

> the following acts that are committed against or engaged in with a person under the age of majority: . . .
>> C. Gross sexual assault, as described in Title 17-A, section 253;
>> D. Sexual abuse of a minor, as described in Title 17-A, section 254;
>> E. Unlawful sexual contact, as described in Title 17-A, section 255-A;
>> F. Unlawful sexual touching, as described in Title 17-A, section 260;
>> G. Sexual exploitation of a minor, as described in Title 17-A, section 282; or
>> H. Incest, as described in Title 17-A, section 556.

Relevant to this case is section 752-C's application to conduct that meets the description of the crime of unlawful sexual contact. Under 17-A M.R.S. § 255-A(1)(A) (2026), a person commits unlawful sexual contact when the person "intentionally subjects another person to any sexual contact and . . . [t]he other person has not consented to the sexual contact and the actor is *criminally negligent* with regard to whether the other person has consented." (Emphasis added). Title 17-A defines "sexual contact" as "any touching of the genitals or

anus, directly or through clothing . . . for the purpose of arousing or gratifying sexual desire or for the purpose of causing bodily injury or offensive physical contact." 17-A M.R.S. § 251(1)(D) (2026).

[¶8] Jason argues that section 752-C does not apply in this case and that we should therefore conclude that Danielle's claims are barred by the default six-year statute of limitations. He apparently concedes that Danielle has established that he subjected her to sexual contact, that she did not consent, and that he acted intentionally, knowingly, or recklessly with regard to her lack of consent. Jason contends that section 752-C's incorporation of the descriptions of criminal offenses means that Danielle was required to establish that he acted with criminal negligence with regard to whether Danielle consented, and that evidence that he acted with some other culpable state of mind cannot bring her claims within the acts covered by section 752-C.

[¶9] A person acts with criminal negligence "with respect to a result" or "with respect to attendant circumstances" when the person "fails to be aware of a risk that the person's conduct will cause such a result" or "that such circumstances exist." 17-A M.R.S. § 35(4)(A)-(B) (2026). Under 17-A M.R.S. § 34(3) (2026), however, "[w]hen the law provides that negligence is sufficient to establish an element of a crime, that element is also established if, with

respect thereto, a person acted intentionally, knowingly or recklessly." Jason argues that we should read section 752-C as adopting Title 17-A's definition of criminal negligence, but not Title 17-A's provision that the term "criminal negligence" encompasses intent, knowledge, and recklessness.

[¶10] As Jason notes, section 752-C was only recently amended to reference specific criminal offenses. P.L. 2023, ch. 475, § 1 (effective Oct. 25, 2023) (codified at 14 M.R.S. § 752-C (2026)). Prior to amendments in 2023, section 752-C defined "sexual acts toward minors" as any "sexual act" or "sexual contact," as defined in Title 17-A, when perpetrated against a "person under the age of minority." 14 M.R.S. § 752-C(2) (2022); *see* 17-A M.R.S. § 251(1)(C), (D) (2026). The amendments had the effect of expanding section 752-C's applicability by bringing certain acts, such as sexual exploitation of a minor and incest, into its definition of "sexual acts toward minors." *See* P.L. 2023, ch. 475, § 1.

[¶11] Accepting Jason's argument would require us to conclude that the Legislature intended to incorporate the elements of crimes that section 752-C enumerates and Title 17-A's definitions relevant to those elements, but not any of Title 17-A's other interpretive provisions. This conclusion would lead to an illogical result, one that seems intrinsically opposed to section

752-C's purpose of "remov[ing] the limitations period for a civil action . . . based on conduct against a minor victim that qualifies as the crime of incest, unlawful sexual contact, sexual abuse of a minor, rape or gross sexual assault, . . . unlawful sexual touching or sexual exploitation of a minor." Comm. Amend. A. to L.D. 1790, No. S-342 (131st Legis. 2023). For example, under Jason's construction, a victim would have no civil recourse past the six-year mark for certain gross sexual assaults that were committed *intentionally*, since 17-A M.R.S. § 253(2)(M) (2026) states that the actor must be "criminally negligent with regard to whether the other person has consented" to a sexual act.

[¶12] We presume that the Legislature, in expanding the scope of civil liability for sexual acts against minors, did not intend to limit liability to acts that are committed negligently. Instead, a defendant must prove that the defendant did not commit one of section 752-C's enumerated acts against the plaintiff. The question of whether the defendant's actions meet the description of the crime cited in section 752-C is informed by Title 17-A's definitions and interpretive provisions, including the provision that proof that a person acted intentionally, knowingly, or recklessly is sufficient to establish the mens rea element of a crime that is defined with criminal negligence as the mens rea required. 17-A M.R.S. § 34(3).

10

## 2.    Analysis

[¶13]  If Danielle has proved that, while she was a minor, Jason subjected her to unlawful sexual contact, Jason cannot prove a statute-of-limitations defense.  Jason committed one of section 752-C's enumerated acts if (1) Jason subjected Danielle to sexual contact, as defined by 17-A M.R.S. § 251(1)(D); (2) Danielle did not consent to the sexual contact; and (3) Jason was criminally negligent, as defined by 17-A M.R.S. § 35(4), or acted intentionally, knowingly, or recklessly with regard to whether Danielle consented to the contact, *see* 17-A M.R.S. § 34(3).  17-A M.R.S. § 255-A(1)(A).

[¶14]  The evidence that Danielle presented at trial is more than sufficient to support the trial court's finding that Jason subjected her to one of the acts enumerated in section 752-C.  The record contains evidence that Danielle was sixteen in January 2011.  Danielle testified that Jason touched her genitals, leg, and breasts over her clothes.  She testified that she did not want him to touch her.  Danielle also testified that she "mentioned a couple of times that [what Jason was doing] was inappropriate," that "[t]here is no doubt in my mind that I did send him messages that it was inappropriate," and that she believed that he clearly understood that she did not consent.  This testimony establishes that

Jason at least "fail[ed] to be aware of a risk that" Danielle did not consent to the contact. *See* 17-A M.R.S. § 35(4).

[¶15]   In short, Danielle's claims were not time-barred because she proved that Jason committed sexual acts toward her when she was a minor.

## B.   Merits

[¶16]  We turn now to the merits of Danielle's claims.  Jason argues that, as a matter of law, Danielle failed to prove her claims for negligence, NIED, and IIED.  While we review a trial court's findings of fact for clear error, we review questions of law de novo.  *Braithwaite-Baril v. McIntosh*, 2025 ME 48, ¶ 2, 339 A.3d 771.  Because Jason did not move for further findings of fact, *see* M.R. Civ. P. 52(b), "we assume that the court implicitly made all findings consistent with the evidence that are necessary to support the judgment."  *Francoeur v. Berube*, 2023 ME 27, ¶ 11, 293 A.3d 418.

### 1.   Negligence

[¶17]  "A cause of action for negligence has four elements: (1) a duty of care owed to the plaintiff; (2) a breach of that duty; (3) an injury; and (4) causation, that is, a finding that the breach of the duty of care was a cause of the injury."  *Est. of Smith v. Cumberland Cnty.*, 2013 ME 13, ¶ 16, 60 A.3d 759.

12

Jason argues that Danielle failed to establish that she suffered *physical* injury, and therefore her negligence claim must fail as a matter of law.[2]

[¶18]  In a general negligence action, the applicable duty of care is "a duty to act reasonably to avoid causing *physical harm* to others."  *Boivin v. Somatex, Inc.*, 2022 ME 44, ¶ 12, 279 A.3d 393 (quotation marks omitted).  "Although each person has a duty to act reasonably to avoid causing physical harm to others, there is no analogous general duty to avoid negligently causing emotional harm to others."  *Curtis v. Porter*, 2001 ME 158, ¶ 18, 784 A.2d 18.  "[P]hysical harm, for which damages are recoverable in an action for general negligence, means the physical impairment of the human body . . . including physical injury, illness, disease, impairment of bodily function, and death."  *Boivin*, 2022 ME 44, ¶ 12 n.3, 279 A.3d 393 (quotation marks omitted).  Although "[t]he presence of injury or damage is . . . a question of fact," *Est. of Smith*, 2013 ME 13, ¶ 17, 60 A.3d 759, "[w]hether a specific injury constitutes bodily harm and therefore supports a claim for liability [in a negligence action]

---

[2] Jason also appears to argue that the court erred in admitting Danielle's medical records, which state that she was diagnosed with post-traumatic stress disorder and summarize some of her symptoms.  Jason does not argue a specific basis for their inadmissibility.  Because he fails to make any argument why the evidence was inadmissible or provide any supporting citations to legal authority, he has waived this issue. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290 (stating that issues discussed "in a perfunctory manner" are waived).

is a question of law for the court to decide," Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 4 cmt. b (A.L.I. 2010).

[¶19]  In *Boivin v. Somatex*, we considered whether the plaintiff's evidence that she suffered from symptoms of post-traumatic stress disorder (PTSD), mental anguish, flashbacks, and night terrors created a genuine dispute of material fact as to a physical injury.  2022 ME 44, ¶¶ 12-13, 279 A.3d 393. We held that, because the symptoms she asserted did not constitute a physical injury or harm, she did not create an issue of fact as to breach of duty.  *Id.* ¶¶ 13-14.  Although the plaintiff argued that her PTSD diagnosis qualified as a physical injury, because none of the symptoms she reported were physical symptoms, we did not reach the question of whether PTSD can ever qualify as a physical injury.  *Id.* ¶ 14.

[¶20]  This case presents an issue similar to the one in *Boivin*.  Danielle testified that she felt anxious, depressed, and isolated; that she suffered from nightmares; and that she experienced flashbacks following the January 2011 incident.  Other witnesses testified that prior to January 2011 Danielle was a happy and outgoing teenager and that after the incident they observed a negative change in her personality and mood.  Danielle testified that she was diagnosed with PTSD, and her medical records show that she suffered from

"episodes of anxiety" which caused her to feel anxious, nauseous, and "as though her heart may be racing." Just as in *Boivin*, however, the symptoms that Danielle described do not, as a matter of law, rise to the level of bodily harm that we have required for common law negligence claims.

[¶21]  Although a plaintiff may be allowed to recover for pure emotional harm in the context of a claim for negligent or intentional infliction of emotional distress, a common law negligence claim requires a physical injury.  In the absence of physical injury, there is no breach of the general duty to avoid causing physical harm to others.  While PTSD could conceivably manifest in physical symptoms that reach the level ordinarily associated with bodily injuries, that level is not established here, and it was error for the court to conclude that it was.

### 2.    Negligent Infliction of Emotional Distress

[¶22]  While the torts of general negligence and NIED are now typically viewed as two separate causes of action, NIED grew out of a set of special duty rules that courts began applying to negligence claims that alleged only emotional harm.  *See* Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 47 cmt. b (A.L.I. 2012).  NIED and general negligence are similar in that they both require proof that the defendant owed the plaintiff a

duty and caused the plaintiff damage by breaching that duty. *Steadman v. Pagels*, 2015 ME 122, ¶ 26, 125 A.3d 713. "Plaintiffs claiming negligent infliction, however, face a significant hurdle in establishing the requisite duty . . . ." *Curtis*, 2001 ME 158, ¶ 18, 784 A.2d 18. This is because we "have recognized a duty to act reasonably to avoid emotional harm to others in very limited circumstances: first, in claims commonly referred to as bystander liability actions; and second, in circumstances in which a special relationship exists between the actor and the person emotionally harmed." *Id.* ¶ 19 (footnote omitted).

[¶23] Jason argues that the court erred by concluding that he and Danielle had a special relationship because they were cousins and because "Jason took on . . . what was really a family responsibility to transport [his relative] during a specifically family emergency, [he was] 21 years older, and he was entrusted with [Danielle's] welfare." Whether there is a special relationship giving rise to a duty to avoid causing emotional harm is a question of law. *See Fortin v. The Roman Cath. Bishop of Portland*, 2005 ME 57, ¶ 35, 871 A.2d 1208.

[¶24] Because there is no general duty to avoid negligently causing emotional harm to others, "the determination of duty in these circumstances is

not generated by traditional concepts of foreseeability." *Curtis*, 2001 ME 158, ¶ 18, 784 A.2d 18. "Only where a particular duty based upon the unique relationship of the parties has been established may a defendant be held responsible, absent some other wrongdoing, for harming the emotional well-being of another." *Bryan R. v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 1999 ME 144, ¶ 31, 738 A.2d 839.

[¶25]  We have held, in limited circumstances, that a defendant may be held liable for negligently inflicted emotional distress directly caused by the defendant's intentional acts. *See Steadman*, 2015 ME 122, ¶¶ 26-29, 125 A.3d 713. We held in *Steadman* that the plaintiff could recover for NIED when her father sexually abused her for years as a minor. *Id.* "The relationship between a custodial parent and child is a 'special relationship' that gives rise to a heightened responsibility of care." *Id.* ¶ 27. Similarly, in *Rowe v. Bennett*, when the plaintiff's therapist began a sexual relationship with the plaintiff's romantic partner, causing the plaintiff emotional harm, we held that "because of the nature of the psychotherapist-patient relationship, an action may be maintained by a patient for serious mental distress caused by the negligence of his therapist." 514 A.2d 802, 803-06 (Me. 1986). In both of those cases, the

nature of the relationship itself, rather than the specific circumstances of the case, imposed a duty to avoid causing severe emotional harm.

[¶26] Much of our jurisprudence on the issue of special relationships, however, concerns defendants' liability for the actions of third parties. It is in this context that we pronounced the rules Danielle relies on to argue that the relationship between her and Jason is a special relationship. The third-party-harm cases are more focused on the case-specific circumstances surrounding the parties' relationship and the foreseeability of the third-party harm. For instance, in *Fortin*, we considered a claim for breach of fiduciary relationship against the Roman Catholic Bishop of Portland brought by a former altar boy who alleged that he was sexually abused by a priest under the supervision of the church. *Fortin*, 2005 ME 57, ¶¶ 37-39, 871 A.2d 1208. We held that the plaintiff's allegations had established a special relationship between him and the church because the plaintiff was a child who was "subject to the supervision, control, and authority of the [church] on a daily basis" and the church "knew or should have known of the risk of harm posed by the priest." *Id.* ¶¶ 34, 38.

[¶27] Likewise, in *Dragomir v. Spring Harbor Hospital*, we considered whether a special relationship existed between a psychiatric patient and a

hospital when a social worker employed by the hospital began a sexual relationship with the patient, causing emotional harm. 2009 ME 51, ¶ 17, 970 A.2d 310. We held that a special relationship could exist because of the "great disparity of position and influence between the parties." *Id.* ¶ 21 (quotation marks omitted). Our holding was based on the "vulnerable psychological condition" of the patient who, due to his condition, was "unable to protect himself from [the] hospital employee." *Id.*; *see also Gniadek v. Camp Sunshine at Sebago Lake, Inc.*, 2011 ME 11, ¶ 23, 11 A.3d 208 (holding that there was no special relationship between a former camp attendee and the defendant camp when a former camp volunteer sexually assaulted the attendee because the camp did not "exercise influence" over the camper).

[¶28] The focus of these cases is on the specific relationships which, by their nature, necessarily involve a disparity of power between a plaintiff who is particularly vulnerable and therefore unable to self-protect and a defendant who, by virtue of a position of power, can foresee third-party harm to the plaintiff and protect the plaintiff from that harm. These cases are inapplicable to the relationship in this case because Danielle was not placed in a uniquely vulnerable position by virtue of some manner of institutional control over her. Here, the only relationship between Danielle and Jason is that they are first

cousins. Unlike a parent-child or physician-patient relationship, that relationship does not carry with it any special obligation to avoid causing emotional harm. And while there is an inherent power differential between an adult man and a teenage girl, it is not the sort of structural power difference that gives rise to an NIED claim, where the defendant has more power to prevent foreseeable harm compared to the plaintiff and the harm is visited upon the plaintiff by a third party. *See Fortin*, 2005 ME 57, ¶ 38, 871 A.2d 1208.

[¶29] In the absence of a special relationship between Danielle and Jason, Jason had no duty to avoid negligently causing emotional harm to Danielle. Because there was no such duty, the trial court erred by finding Jason liable for negligent infliction of emotional distress.

### 3. Intentional Infliction of Emotional Distress

[¶30] We turn to Danielle's final claim—intentional or reckless infliction of emotional distress. A plaintiff must prove four elements to prevail on an IIED claim:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from the defendant's conduct;
> (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community;
> (3) the actions of the defendant caused the plaintiff's emotional distress; and

(4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Lyman v. Huber*, 2010 ME 139, ¶ 16, 10 A.3d 707 (alterations omitted). Jason does not argue that the first three elements were not adequately proved but argues only that the evidence was insufficient to support a finding that Danielle's emotional distress was "so severe that no reasonable person could be expected to endure it." The trial court determined that, although Danielle was "doing awfully well," she "endured [the emotional distress] at a cost of a decade of recurrent symptoms and a decade of pharmaceuticals" and found that her distress was severe.

[¶31] The question whether a party's emotional distress is severe enough to support an IIED claim is a question of law. *See id.* ¶ 26

[¶32] We first recognized the tort of intentional infliction of emotional distress in *Vicnire v. Ford Motor Credit Co.*, where we adopted the Restatement (Second) of Tort's rule that the emotional distress suffered by the plaintiff must be "so severe that no reasonable man could be expected to endure it." 401 A.2d 148 (Me. 1979) (quoting Restatement (Second) of Torts § 46 cmt. j (A.L.I. 1965)). In *Vicnire*, we held that "[a]lthough severe emotional distress is usually manifested by shock, illness or other bodily harm, such objective symptomatology is not an absolute prerequisite for recovery . . . . *In appropriate*

*cases, severe emotional distress may be inferred from the extreme and outrageous nature of the defendant's conduct alone.*"  *Id.* at 154 (emphasis added) (citation and quotation marks omitted).  Therefore, "[t]he element of severe emotional distress may be satisfied two ways—either by proof of objective symptomatology or by inference based on the extreme and outrageous nature of the defendant's conduct."  *Deane v. Cent. Me. Power Co.*, 2024 ME 72, ¶ 44, 322 A.3d 1223.

[¶33]  Danielle's objective symptoms of emotional distress are certainly substantial.  We need not discuss them further, however, because the conduct found in this case is so extreme and outrageous that severe emotional distress may be inferred.

[¶34]  The purpose of the requirement that the IIED plaintiff prove objective symptoms of emotional distress is to "provide[] some assurance that the harm is genuine."  Restatement (Third) of Torts: Liability for Phys. & Emot. Harm § 46 cmt. j (A.L.I. 2012).  Therefore, we have recognized that "[a]n inference of severe emotional harm is available only in the very narrow circumstance where the conduct is so extreme and outrageous that no reasonable person could endure the emotional response the conduct would

22

naturally generate." *Deane*, 2024 ME 72, ¶ 56, 322 A.3d 1223 (quotation marks omitted).

[¶35]   We held in *Deane* and in *Lyman v. Huber* that the respective defendants' actions were not extreme and outrageous enough to support an inference of severe emotional distress. *Id.* ¶ 57; *Lyman*, 2010 ME 139, ¶ 22, 10 A.3d 707.   The conduct in question here, however, is undoubtedly more outrageous than defendants' conduct in those cases.   Notably, while the defendant in *Lyman* subjected the plaintiff to fifteen years of emotional abuse, both parties were adults in a consensual romantic relationship.   *See Lyman*, 2010 ME 139, ¶ 3, 10 A.3d 707.  The defendant in *Lyman* did not physically or sexually assault the plaintiff, although he was "commanding and intimidating to the point that [the plaintiff] feared him and his anger." *Id.* ¶ 9.  Here, Danielle was a teenager in a vulnerable position, and she was exploited by her much older family member.   Jason subjected her to hours of inappropriate sexual touching and questioning, in a vehicle from which she could not escape, an already egregious course of conduct which then culminated in him exposing himself to her and threatening the lives of her parents and brother if she ever disclosed what he had done to her.

[¶36]   The sexual assault of a minor by an adult family member is unquestionably extreme and outrageous.  We hold that the specific facts and circumstance presented by this case lead to a conclusion that the conduct was so outrageous that "no reasonable person could endure the emotional response the conduct would naturally generate." *Id.* ¶ 22.  Extreme emotional distress is the natural consequence of such an assault, especially in view of evidence showing that Danielle had no viable way to escape or avoid the assault.  The trial court could have properly inferred that Danielle's emotional distress was severe.  Because Jason did not make a motion for further findings of fact, we will assume that the court made that inference because it is supported by the evidence. *See id.* ¶ 19.  Therefore, the trial court did not err when it found Jason liable for intentional infliction of emotional distress.

### III.  CONCLUSION

[¶37]  To summarize, we hold that the court erred in finding Jason liable for general negligence and negligent infliction of emotional distress.  We conclude that there was no error in the court's finding of liability for intentional infliction of emotional distress.

The entry is

> Judgment on Counts 1 and 2 vacated.  Judgment
> on Count 3 affirmed.

Lee H. Bals, Esq. (orally), Marcus|Clegg, Portland, for appellant Jason D. Nadeau

Kristin T. Murray-James, Esq. (orally), Timothy M. Kenlan, Esq., and Joseph G.E. Gousse, Esq., Berman & Simmons, P.A., Lewiston, for appellee Danielle Nadeau

Penobscot County Superior Court docket number CIV-2024-4
FOR CLERK REFERENCE ONLY